**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CHERYL A. MORETT**<br>354 East Cedarville Road<br>Pottstown, PA 19465 | NO. 2:20-cv-00872-PD |
| *Plaintiff,* | CIVIL ACTION |
| **vs.** | JURY TRIAL DEMANDED |
| **PENNSBURY SCHOOL DISTRICT**<br>134 Yardley Road<br>Levittown, PA 19058 | |
| and | |
| **WILLIAM GRETZULA** | |
| and | |
| **DONNA DUNAR** | |
| and | |
| **JOSEPH O'BRIEN** | |
| and | |
| **DEBRA WACHSPRESS** | |
| and | |
| **JOSHUA WALDORF** | |
| and | |
| **CHRISTINE TOY-DRAGONI** | |
| *Defendants* | |

## FIRST AMENDED COMPLAINT

Plaintiff, by and through undersigned counsel, hereby files the following Complaint against Defendants:

### INTRODUCTION

1.      Plaintiff initiates this action to seek redress against each Defendant for unlawful violations of Title VII of the Civil Rights Act ("Title VII"), Retaliation, Hostile Work Environment, Stigma Plus, Conspiracy and other applicable law.

### PARTIES

2.      Plaintiff, Cheryl A. Morett ("Plaintiff") is an adult individual currently residing at the above-captioned address.

3.      Defendant, Pennsbury School District ("Defendant") is a Pennsylvania school district at the above-captioned address.

4.      Defendant, William Gretzula, was at all times relevant hereto the Superintendent of Pennsbury School District.

5.      Defendant, Donna Dunar, was at all times relevant hereto the Assistant Superintendent of Pennsbury School District.

6.      Defendant, Debra Wachspress, was at all times relevant hereto a member of the Pennsbury School Board.

7.      Defendant, Joshua Waldorf, was at all times relevant hereto a member of the Pennsbury School Board.

8.      Defendant, Christine Toy-Dragoni, was at all times relevant hereto a member of the Pennsbury School Board.

9.      At all times relevant hereto, Defendant Pennsbury School District acted by and through its agents, servants, and employees, each of whom acted within the scope of his or her job duties.

10.     At all times relevant hereto, individual Defendants, William Gretzula, Donna Dunar, Joseph O'Brien, Debra Wachspress, Joshua Waldorf, and Christine Toy-Dragoni conspired together maliciously, outrageously, deliberately, willfully, wantonly and /or recklessly with the common intent to deprive Plaintiff of her constitutionally protected rights and defame her.

11.     At all times relevant hereto, individual Defendants, William Gretzula, Donna Dunar, Joseph O'Brien, Debra Wachspress, Joshua Waldorf, and Christine Toy-Dragoni acted individually maliciously, outrageously, deliberately, willfully, wantonly and /or recklessly with the intent to deprive Plaintiff of her constitutionally protected rights and to defame her.

12.     Defendant is an "employer" within the meaning of Title VII because it is engaged in an industry affecting interstate commerce and because they maintained or maintain fifteen (15) or more employees for each working day in each of twenty (20) or more weeks in the current or preceding calendar year.

13.     Defendant also maintains enough employees to satisfy the jurisdictional prerequisites of the Pennsylvania Human Relations Act (requiring four or more employees).

## JURISDICTION and VENUE

14.     All the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if set forth at length.

15.     The Court may properly maintain personal jurisdiction over Defendants because Defendants' contacts with this Commonwealth and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and

3

substantial justice, satisfying the standard set forth by the Supreme Court of the United States in International Shoe Co. v. Washington, 326 U.S. 310 (1945) and its progeny.

16.     The United States District Court for the Eastern District of Pennsylvania may exercise original subject-matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of civil rights.

17.     The Court may also maintain supplemental jurisdiction over state law claims set forth herein pursuant to 28 U.S.C. § 1367(a) and Rule 18(a) of the Federal Rules of Civil Procedure because they are sufficiently related to one or more claims within the Court's original jurisdiction in that they form part of the same case or controversy.

18.     Venue is properly laid in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because Defendants are located in and conduct business in this judicial district and because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district (Plaintiff was employed in the Eastern District of Pennsylvania at the time of the illegal actions set forth herein).

**PROCEDURAL and ADMINISTRATIVE REMEDIES**

19.     All the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

20.     Plaintiff has satisfied the procedural and administrative requirements for proceeding with an action under Title VII and the PHRA.

21.     Plaintiff filed a written charge of discrimination with the Equal Employment Opportunity Commission and Pennsylvania Human Relations Commission alleging discrimination on or about July 9, 2019 (No. 530-2019-00402).

4

22.     The instant action is timely because it was initiated within ninety ("90") days after the receipt of a Right to Sue letter mailed on or about November 18, 2019.

23.     Plaintiff has exhausted all federal administrative remedies as to the allegations of the instant Complaint.

24.     Plaintiff will seek leave to amend this complaint at any time up to, and including during trial, to incorporate a claim under the PHRA after the expiration of that act's one year waiting period in a manner consistent with Fed.R.Civ.P. 15.

## FACTUAL BACKGROUND

25.     All allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

26.     Plaintiff is a Caucasian female.

27.     Plaintiff's date of birth is January 23, 1962.

28.     Plaintiff worked for Defendant, Pennsbury School District (Pennsbury) from July 1, 2013 until July 3, 2019 when she was unlawfully terminated.

29.     Plaintiff was the Director of Special Education for Pennsbury.

30.     Plaintiff's termination was based on the unlawful discrimination bases of sex and race and further, in retaliation for both the formal and informal complaints she made within the School District and for her EEOC Complaint.

31.     Beginning in early 2016, Plaintiff witnessed instances of blatant discrimination.

32.     During a Board Executive session in early 2016, the members of the cabinet were asked to leave room leaving in attendance Mrs. Rarrick, HR Director, a white heterosexual female, Mr. Rodgers, a white heterosexual male, Dr. Elliot Lewis, Assistant Superintendent, a white

heterosexual male, and Dr. Donna Dunar, Assistant Superintendent, a white heterosexual female, and the Plaintiff.

33.     At this meeting, Dr. Dunar and Dr. Lewis discussed, among other things,  Mr. Brian Shaffer, a gay male married to an African American husband and children, work performance and during this discussion Dr. Dunar referred to Mr. Schaeffer on two occasions as "as a crotchety gay guy", she also stated that "he hated women".

34.     The following day, Plaintiff contacted Bettie Ann Rarrick, Director of HR to complain about these derogatory remarks.

35.     During Plaintiffs employment at Pennsbury, a pattern of Dr. Dunar going after administrators she did not like became apparent.

36.     Plaintiff then met with Superintendent Gretzula (Gretzula) and HR Director, Mrs. Rarrick (Rarrick) on July 5, 2016 to complain about being harassed, undermined and in constant fear of losing her job over the past three years by Dr. Dunar.

37.     At this meeting, Plaintiff also discussed her discomfort regarding Dr. Dunar's treatment of colleague Brian Shaffer and the extremely derogatory remarks she had made regarding his sexual orientation during discussion about his work performance.

38.     Prior to Gretzula's employment, Mr. Sherwood Taylor had retired from his position as Director of Pupil Services.

39.     It was determined that there was no need to refill this position as it was redundant and could be incorporated into the duties of the Special Education Department.

40.     The decision was also made to reduce the number of administrators; a cost savings of approximately $200,000.00 to the taxpayers.

41.     When Gretzula began his tenure, he stated he would keep the position because he had

"*someone*" whom he wanted to fill it.

42.     Plaintiff informed Gretzula that she could take over the Pupil Service Department and was willing to do so as she was Director of Special Education.

43.     In response, Gretzula ordered the Plaintiff not to tell that to any of the Board because he wanted to keep the position.

44.     In July 2017, when this issue resurfaced, Plaintiff informed Jacqueline Redner, School Board President, that when Mr. Sherwood Taylor left in June of 2016, she was willing to take on the position of Pupil Service Director in addition to her current role in order to provide savings to the District and that Dr. McHugh, the former superintendent had prior to his leaving, left a plan for her to do so.

45.     Redner informed Plaintiff that Gretzula, in direct contradiction to Plaintiff's willingness to assume these duties, had told the Board that Plaintiff did not want to take assume the Pupil Service position in addition to her role because it was too much work for her and she had too much on her plate.

46.     Plaintiff told Redner that this was false.

47.     On information and belief, Gretzula did not want Plaintiff in the Pupil Service position because she had told Mr. Shaffer about Dr. Dunar's derogatory comments.

48.     Specifically, in the Fall of 2016, Gretzula told Dunar that "Sherri Morett had fed the monster" and that was why she was being investigated.

49.     Dunar shared this information with Plaintiff in May of 2018.

50.     She stated that the "monster" was her telling ("feeding") Mr. Shaffer about these comments.

51.     In the Fall of 2016, Dunar was leading the District Goal for Excellence and Equity

under the direction of Gretzula.

52.     During a presentation to administrators Dunar showed a PowerPoint slide with District data based on free and/or reduced lunch.

53.     On one of the slides Dunar included the words "Free Blacks" to depict African American students who received free and/or reduced lunch.

54.     The next day, Plaintiff told Greztula that the use of "Free blacks" was racially offensive and that it should be removed from the PowerPoint.

55.     Gretzula said someone should tell Dr. Dunar, to which Plaintiff replied, "yes they should, but I'm not her supervisor."

56.     Plaintiff also complained to Rarrick , HR Director, about the use of the term.

57.     During a School Board meeting the following month, Dunar again presented the PowerPoint and "Free Blacks" was still part of the presentation.

58.     There was no follow up from Plaintiff's complaint and, notably, the PowerPoint was only just recently removed from the District's website.

59.     While in a meeting on November 16, 2016, with building principals and a few central office staff members, Gretzula said, that as a child, he was called a "Green Bow-Tied Faggot".

60.     Mr. Shaffer told Gretzula how upset this made him and Gretzula thanked him for confiding his concerns and for giving him a new perspective.

61.     Despite their conversation, at later meetings Gretzula again told the story of him being the *"other"* and being called a "Green Bow-Tied Faggot.

62.     After the Principal's meeting, Plaintiff complained to Rarrick about Gretzula's continued use of the word Faggot.

63.     However, her complaint was never investigated.

64.     In August of 2017, during an Administrative retreat, Gretzula showed a clip of a soccer group doing a very male centered tribal pre –battle Maori Haka dance.

65.     He said he wanted his administrative staff to perform this dance at the Invocation.

66.     Although Plaintiff didn't want to perform the dance because it was sexist, she did because she wanted to try to support Gretzula in the opening of the new school year.

67.     Other female administrators also participated because they felt obligated but also felt that the dance was sexist and sent the wrong message to the staff.

68.     In August of 2017, Plaintiff was appointed as the lead for the District's goal on Mental Health and Opioid Task Force.

69.     Throughout the year, Plaintiff wrote and was awarded numerous grants and her initiatives were recognized by Congress.

70.     When Plaintiff first created the committee and developed the plan, a press conference was planned to unveil the initiative to the public and local politicians.

71.     It was decided that Redner would speak, Gretzula would speak and Plaintiff would speak during the press conference.

72.     Gretzula later informed Plaintiff that he didn't want her to speak, that he wanted Mr. Ryan Staub, Asst. Principal, to speak in her place.

73.     Plaintiff asked Gretzula why since Ryan did not have all the information to speak to about the plans.

74.     Gretzula responded that he wanted to showcase Ryan, a male administrator, rather than Plaintiff.

75.     Gretzula was motivated by his gender discrimination.  He routinely undermined the work done by females in leadership positions.

76. In October of 2017, based on Gretzula's approval of Mrs. Lisa Becker's District gifted goal, Mrs. Becker and Plaintiff addressed the Board Education Committee about changing the gifted program to be more inclusive.

77. Plaintiff disagreed with the District's program and informed Gretzula on numerous occasions that the District was not in compliance with Chapter 16 regulations.

78. Plaintiff also requested, numerous times, that Gretzula either let her oversee the entire gifted program to ensure compliance with the law or take her out altogether as she did not want to be involved in non-complaint program.

79. Plaintiff explained to Gretzula that the District could not defend cases regarding administration of the gifted program because of their non-compliance.

80. Gretzula would not allow her to change district practices nor would he allow her to remove herself from her role in the gifted program.

81. Instead, Gretzula retaliated by blaming Plaintiff for everything that went wrong with the gifted program.

82. In November of 2017, Mrs. Sanderson presented to the administrative staff where she told numerous stories stereotyping all white people as being racist.

83. Mrs. Sanderson also stated during the presentation, when questioned about gay men, that gay people will have to wait their turn and get in line behind the African Americans.

84. Plaintiff left that presentation feeling uncomfortable and complained about Sanderson's racially discriminatory statements to Gretzula and to Rarrick.

85. In early December of 2017, Plaintiff wrote a detailed letter to board member, Redner, complaining about the use of derogatory remarks by District administration, including Gretzula's continued use of the word faggot.

86.     Plaintiff was interrogated in January of 2018 by Mike Clark, Esquire and Mr. Peter Amuso, Esquire, District Solicitor.

87.     During the questioning, Plaintiff once again complained about the discrimination, harassment, retaliation and the hostile environment she was subjected to.

88.     Plaintiff also reiterated once more that the District's gifted program not in compliance with the law and that both she and the District's special education attorney had alerted Gretzula via email to no avail.

89.     In December 2017, Mr. Clark contacted Gretzula to let him know that they would be hiring a consultant to work with him to address concerns and complaints that were brought forward from administrative staff.

90.     They agreed to hire Dr. Joseph O'Brien, Director of the Chester County Intermediate Unit; a personal friend of Gretzula.

91.     On January 29, 2018, an Excellence and Equity meeting was held.

92.     At that meeting, Gretzula went from anger to tears and back describing how he had been accused of being discriminatory, both racially and gendered, and homophobic in complaints to the board.

93.     Plaintiff was alarmed by Gretzula's anger and what he was saying because she had complained to the Board and was fearful that he had knowledge of this.

94.     Plaintiff was afraid that Gretzula was going to call her out to humiliate her in front of her colleagues.

95.     Plaintiff again complained to Rarrick about Gretzula and demanded an end to the harassment, hostile environment, and retaliation and implored that this complaint be held in confidence from Gretzula.

11

96.     Gretzula's actions continued to be harassing and retaliatory.

97.     Based on these complaints, in February 2018 Plaintiff was again interrogated, this time by Rarrick and Peter Amuso, District Solicitor.

98.     Again, there was no resolution to the issues.

99.     In January of 2018, Plaintiff and other aggrieved colleagues resorted to hiring an attorney to send a letter of cease and desist to the District in hopes that all retaliation would stop.

100.     Plaintiff was questioned on February 26, 2018 and March 16, 2018 by Dr. Joseph O'Brien in his capacity as consultant regarding her complaints against Gretzula.

101.     Plaintiff felt intimidated and threatened during these interrogations.

102.     On or about April 24, 2018 Dr. O'Brien made a presentation at a cabinet meeting on his findings.

103.     During his presentation, Dr. O'Brien made both derogatory and racist comments.

104.     He used the word faggot in reference to homosexuals as a show of support for Gretzula.

105.     When relating a story about being in Norristown the previous night, he stated you never know what those people are going to do to you at night if you're white.

106.     Stating that his message was on behalf of the school board, Dr. O'Brien went on to publicly humiliate, harass and bully Plaintiff repeatedly.

107.     He identified those who complained about Gretzula using their initials and spoke at length about them and the details of their complaints.

108.     Using their initials, O'Brien proceeded to openly chastise Plaintiff for her friendship with Redner and stated openly that it could jeopardize her certification.

109.     Having been put on an Improvement Plan, Plaintiff asked O'Brien what was on it.  He replied, "you should know" and then falsely stated that all the principals had complained that she

never came to their buildings and didn't support them.

110.    In addition to Plaintiff, two other individuals who made complaints against Gretzula were also singled out in a similar manner.

111.    Plaintiff left the meeting feeling devastated, humiliated, ashamed, extremely overwhelmed, and in fear for her job.

112.    Plaintiff's feelings of fear and anxiety increased to the point where she needed to seek medical attention.

113.    Following that cabinet meeting, Plaintiff complained of this intensely hostile treatment to Rarrick by letter.

114.    In April 2018, during an Executive Session, board member, Debra Wachspress (Wachspress) retaliated again recklessly stating that Plaintiff was a troublemaker and that Redner and she had conspired to get rid of Gretzula so that Redner could offer Plaintiff the Superintendent's position.

115.    Additionally, in a show of support for Gretzula, Wachspress used the words "faggot", "nigger" and "dirty kike" at this meeting.

116.    Wachspress was only stopped when other Board members screamed that hat her comments were highly offensive.

117.    By way of explaining her words, Wachspress stated that she was entitled to use these words because she had no idea who was or wasn't offended.

118.    During this meeting, Gretzula, Wachspress and board member, Joshua Waldorf, referred to Plaintiff as an "evil women" and said that she needed to be put in her place or fired.

119.    In April 2018, it came to light that Gretzula and Michele Spack, a District administrator, had been meeting with the gifted parent group and they had again wrongfully blamed all the

problems within the gifted program on Plaintiff and Mrs. Lisa Becker.

120.    In May 2018, Plaintiff complained to Rarrick, HR Director, describing what had transpired regarding the gifted program and the wrongful accusations and retaliation against her.

121.    In May 2018, two days prior to the Board meeting, Plaintiff was informed that under the new Act 93 Agreement she had been moved from an Independent Compensation Plan to the PASA group.

122.    Plaintiff was never informed of this by Gretzula or Mr. Clark nor was she given an opportunity for a "meet and greet".

123.    The PASA agreement was not shared with Plaintiff and she was told that she could not get a copy because she was not part of the PASA group at that time.

124.    Upon learning this, Plaintiff complained in writing to Rarrick on May 15, 2018 about this change in pay structure that was implemented without consent or input from her.

125.    Later that month, the members of PASA met to determine the number of days they would agree to sell back for their insurance contribution; Plaintiff was told that she was not allowed to take part in the process as she was not a member of the group until July 1, 2018 even though this directly affected her salary.

126.    When the Excellence and Equity Committee and administrative team met in May 2018, they were directed to do an activity that included finding beads that represented race, sexual preference and disabilities.

127.    The beads were colored and labeled as follows: Brown for African American, Red for Native American, Yellow for Asian, White for White, Tan for Multi-cultural, Purple for Gay and Green for Disabilities.

128.    The activity involved selecting the colored beads that represented any of the

categories a participant identified and put them in a clear cup. Participants were then to do the

same for spouse, friends, doctors, family members. Once the beads were in the cup, a discussion

was to be had about the make-up of the cups both individually and as a whole.

129. This exercise was extremely racist and discriminatory and forced people to identify

areas of their personal life in a public setting.

130. This made Plaintiff and others in attendance very uncomfortable.

131. Two weeks later, the group was again asked to reflect on the bead activity and again

discuss what it says about each of us.

132. After the activity, many administrators, including Plaintiff and Mr. William Jeffery,

an African American male, complained about the inappropriate and discriminatory activity.

133. In May of 2018, Plaintiff presented a plan to the Board to start a new program in one

of the District's buildings that was being used by Lifeworks.

134. Plaintiff opened a dialogue with Rodgers and Gretzula about the idea in February of

2018 informing them that the move would be both cost-saving and better for the students.

135. Gretzula stated that he was against Plaintiff's proposal knowing that the move was

best for Pennsbury's students and would save the District money.

136. On June 12, 2018, Redner and Plaintiff met with Gretzula in his office to discuss all

her complaints of discrimination and hostility toward her and the retaliation against her for these

complaints.

137. During this meeting, rather than address Plaintiff's concerns, Gretzula stated that he

believed that Plaintiff was trying to take his job.

138. Plaintiff assured him that this was not the case.

139. During the June 2018 Board meeting, Plaintiff's proposal to take over the Lifeworks

program and create Village Park Academy was passed.

140.    That weekend, Plaintiff sent an extremely detailed plan for this to the School Board.

141.    Mr. Joshua Waldorf (Waldorf) replied that she was not to ever contact the School Board Members directly and that all communications had to be sent via Gretzula.

142.    Plaintiff was shocked by this as this was never problematic in the past.

143.    That same day, Waldorf sent an email to the entire Board stating that Plaintiff should be reprimanded to the highest degree possible for insubordination for sending the email.

144.    In two subsequent emails, Waldorf again stated Plaintiff was insubordinate and should be fired.

145.    During a July 2018 Executive Session, Waldorf, in a show of support for Gretzula, used the word faggot.

146.    Mr. Clark responded that he was offended by his use of the word.

147.    Wachspress again wrongfully accused Plaintiff of being a troublemaker who caused all of the problems in the District and that they needed to give Gretzula a five-year contract to shut up the people making complaints, including Plaintiff, against him.

148.    Plaintiff was again declared an "evil woman" and Wachspress and Waldorf called for her to be fired.

149.    In August 2018, at a Board Executive Session, the board members were discussing the 3 EEOC Complaints that were made against Gretzula.

150.    Waldorf and Wachspress stated that those who made complaints should be fired.

151.    The District Solicitor stated that they could not fire anyone who filed an EEOC Complaint.

152.    Gretzula asked whether Plaintiff had filed an EEOC Complaint and if not, would he

have Board support to fire her.

153.    There was an agreement that he would be supported if that were the case.

154.    In August of 2018, Gretzula met with Mrs. Becker and stated that the Board was going to give him a new contract and that he was going to clean house and get rid of his central level administrative staff, including Plaintiff.

155.    At the September School Board meeting, Gretzula read a letter stating that he was not seeking a successor contract.

156.    At the end of that meeting, board members, Wachspress, Waldorf, Mr. Sanderson and Mrs. Toy-Dragoni all read prewritten statements that blamed administrators who had complained about Gretzula for his intent to leave the District and implored the public to not let it happen.

157.    The aforementioned board members planned the entire event, leaked it to social media, and started a more intense smear campaign against Plaintiff.

158.    Wachspress and Annette Dearolf (Dearolf), head of the gifted parents association at Pennsbury, were the leaders in the campaign against Plaintiff and they went so far as to falsely tell members of the public that Plaintiff would be named Superintendent unless they came out to protest.

159.    Throughout the following week, Dearolf and other members of the PAGE Facebook group wrongfully accused Plaintiff of pushing Gretzula out and lied about her and her reputation.

160.    Based on information purportedly from Gretzula, there was public discussion where group member falsely stated that Plaintiff was not credentialed or experienced with gifted students and made no effort to attend conferences.

161.    While they were doing this, Mrs. Amy Kirk continually reminded the members of the PAGE group that their attorney cautioned them that they could be held liable for slander.

162.    In response to the slanderous Facebook comments, Plaintiff complained to Mr. Clark and Rarrick about the crusade against her and implored that this was orchestrated by Gretzula in retaliation for her complaints against him of discrimination, creating a hostile work environment and retaliation.

163.    Gretzula resigned from his position in September 2018 for a short time.

164.    During the October 2018 Board meeting, broadcast on both television and radio, Plaintiff was verbally stoned for over an in a well-orchestrated attack on her character as retaliation for her complaints against Gretzula.

165.    Defendants Wachspress, Gretzula and Dearolf conspired and developed a concise plan to have members of the community verbally assault Plaintiff both personally and professionally at the meeting with no regard as to the truth of their statements.

166.    They selected a long line of individuals to speak out against Plaintiff and Redner during the public commentary.

167.    Each individual was allowed five minutes to speak and during this time there were countless false accusations and mischaracterizations of Plaintiff

168.    Every time something especially venomous was said about Plaintiff or Redner, there was a standing ovation all in attendance.

169.    During this time, neither the District Solicitor nor Gretzula intervened to stop the outrageous verbal assault.

170.    Plaintiff was left feeling embarrassed, ashamed, and has since suffered numerous daily panic attacks daily induced by significant anxiety caused by Defendants.

171.    The stories that were started during the board meeting were not true, Gretzula was fully aware of this and that it would be harmful to Plaintiff's career, and yet encouraged this to occur.

172.    Board members and Gretzula repeatedly stated that Plaintiff needs to be put in her place, and it has to do with her being female.

173.    Gretzula is threatened by the women in the District who are strong leaders as has been shown throughout his tenure as Superintendent.

174.    For example, when a female was the number one candidate for the position of Director of Pupil Service, Gretzula tried to convince the team not to hire her stating that "it's not about the job, it's about the right person in the right job" even though she was the number one candidate for 11 of the 12 people in the room.

175.    Since Gretzula has been in the District, there have been 13 administrative openings and 10 of those went to males.

176.    The middle school campus is now entirely made up of male administrators and when the female administrators discussed the need to have a female administrative presence on the campus for the young teen girls, Gretzula ignored the concerns.

177.    Gretzula has also made comments about the need to plan for retirements of female employees.

178.    He stated that Rarrick, a female over 60, needed to hire a supervisor to plan for her departure even though she never stated that she was departing.

179.    Gretzula also stated to Plaintiff, a female over 50, that she wasn't going to be around forever and wanted to know if she was grooming anyone for her position.

180.    On or around September 27, 2018, Gretzula began a financial audit of Village Park Academy (VPA), the alternative school opened by Plaintiff in August 2018, in hopes that it would show a cost to the District.

181.    At that time the school had only been open 1 month and was not close to its student

capacity.

182.     In the 5 plus years that Plaintiff had been with the District there was never an audit of any of the new programs while in their infancy.

183.     On November 8, 2018, at a Finance Committee Meeting, the topic VPA was on the agenda.

184.     The results of the comprehensive and detailed audit were presented at this meeting.

185.     The audit showed that the program was already saving the District money.

186.     The fact that Gretzula began an audit of the school newly opened by Plaintiff was yet another instance additional retaliation.

187.     On November 14, 2018, Plaintiff was informed that Wachspress had a conversation on November 13, 2018 with Redner.

188.     In this conversation, Wachspress asked Redner if she had connections with Mr. Kevin Dorsey, Director of Technology, Mr. Brain Schaffer, Principal, and Ms. Elizabeth Aldridge, Director of Pupil Service, all of whom had filed Complaints with the EEOC against Gretzula.

189.     Wachspress then asked if Redner could get them to drop their EEOC Complaints.

190.     Redner said that she did not have personal connections and could not speak with them and ask that they drop their Complaints.

191.     Wachspress further asked Redner about Plaintiff's EEOC complaint.

192.     Redner informed her that she would not ask Plaintiff to drop her compliant because she believed that Plaintiff has a legitimate complaint.

193.     Wachspress then told Redner that former Superintendent, Dr. Kevin McHugh, had left hand-written notes for Gretzula stating that Plaintiff "was not a team player", that "she did not play well with others" and that he should be cautious with her.

194.    It was discovered, with the involvement of McHugh, that this was false.

195.    After McHugh left, Plaintiff went to Rarrick, HR Director, and asked her to come to Gretzula's office with her to bear witness as Plaintiff planned to confront him about the lies.

196.    Plaintiff told Gretzula about Wachspress' wrongful accusations and told him that it and example of the continued hostile environment she was forced to endure as was retaliation for complaining about it.

197.    Gretzula stated that he wasn't going to get involved in the game and he wasn't going to be dragged through the mud.

198.    Plaintiff replied that *she* was being dragged through the mud and that *she* was the one whose career was being ruined.

199.    Gretzula was angry and annoyed and stated that he couldn't answer for the alleged allegations from Wachspress.

200.    Plaintiff informed him that she felt sick everyday coming to work due to the hostile environment, constant harassment and retaliation for complaining about these wrongs.

201.    On December 4, 2018. Waldorf, who was running for School Board President, stated to several Board Members that he had 2 goals as President, first, to give Gretzula a new contract and second, to support Gretzula in his mission to "clean house" and get rid of any administrator who had complained about him or didn't support him.

202.    In April of 2019, Plaintiff gave her letter of resignation due to ongoing harassment, hostile work environment, discrimination and retaliation.

203.    Plaintiff's resignation was a constructive discharge as the toxic atmosphere and coordinated attacks on her by the District was untenable for her maintain employment there.

204.    Although Gretzula had stated that he was letting Plaintiff go to start her new position,

21

the letter that he provided did no such thing.

205.    Plaintiff was unnecessarily held by Pennsbury through July 3rd, which was further

retaliation against her.

## COUNT I

### Title VII Violations
### Pennsbury School District

206.    All of the allegations contained in the foregoing paragraphs of this Complaint are

incorporated by reference herein as if the same were set forth at length.

207.    At all times relevant herein, Plaintiff was subjected to unlawful retaliation by

Defendant, Pennsbury School District.

208.    At all times relevant herein, Plaintiff was subjected to an unlawful hostile-work

environment by Defendant, Pennsbury School District.

209.    As a direct and proximate result of these violations, Plaintiff has sustained the

injuries, damages and losses set forth herein.

## COUNT II

### PHRA
### Pennsbury School District

210.    All of the allegations contained in the foregoing paragraphs of this Complaint are

incorporated by reference herein as if the same were set forth at length.

211.    Defendant Pennsbury School District violated the PHRA.

212.    As a direct and proximate result of these violations, Plaintiff has sustained the

injuries, damages and losses set forth herein.

## COUNT III

### Civil Rights 42 U.S.C.A. § 1983
### Pennsbury School District & Individual Defendants

213.    All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

214.    The Defendants, while acting in their official capacities as employees of the Pennsbury School District, and individually, violated Plaintiff's procedural and due process rights and deprived Plaintiff of rights, privileges and immunities secured by the Constitution of Pennsylvania and the Constitution of the United States of America.

215.    The Defendants have engaged and continue to engage in behavior that violates Plaintiff's constitutional First Amendment rights both individually and as an employee of Pennsbury School District in retaliating against her for partaking in protected activities by making both formal and informal complaints within the school District regarding discrimination, harassment and retaliation and for making an EEOC complaint and has thereby irreparably injured Plaintiff.

216.    The Defendants, both collectively and individually, engaged and continued to engage in behavior that violates Plaintiff's constitutional right in her reputation through their actions.

217.    A stigma has been placed upon Plaintiff by the accusations, characterizations and harassment by the Defendants.

218.    Plaintiff's reputation in the workplace and in the community has been damaged by the actions of the Defendants.

219.    The Defendants conspired with one another to deprive Plaintiff of her constitutionally protected rights of procedural due process, her First Amendment rights, her liberty interest in her reputation, and her rights to the equal protection of the law.

220.     Defendant, Pennsbury School District, engaged in a pattern, practice, or custom of conduct violative of the rights enumerated above, with said pattern, practice and custom being evidenced by, among other things, similar treatment of others because of their gender or protected speech.

221.     Defendants,  by the above referenced conduct, have violated §1983.

222.     As a direct and proximate result of Defendants' violation of §1983, Plaintiff has sustained the losses and damages set forth herein.

## COUNT IV

### Civil Rights 42 U.S.C.A. § 1985(3)
### Individual Defendants

223.     All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

224.     The individual Defendants, William Gretzula, Donna Dunar, Joseph O'Brien, Debra Wachspress, Joshua Waldorf, and Christine Toy-Dragoni have entered into conspiracies with each other, at one time or another, to deprive Plaintiff, either directly or indirectly, of her privileges and immunities under the laws, specifically Plaintiff's civil rights guaranteed by the Fourteenth Amendment of the United States Constitution.

225.     Plaintiff has been injured by being deprived of his rights and privileges as a citizen of the United States and has been damaged as a result thereof.

## COUNT V

### Equal Protection
### Pennsbury School District

226.     All of the allegations contained in the foregoing paragraphs of this Complaint are

incorporated by reference herein as if the same were set forth at length.

227.    Plaintiff has a right to equal protection under the law secured by the Fourteenth Amendment of the United States Constitution.

228.    Defendant Pennsbury School District violated Plaintiff's right to equal protection by engaging in conduct not rationally related to legitimate government objectives by retaliating against Plaintiff for her formal and informal complaints within the District and through the EEOC.

229.    Defendant Pennsbury School District violated Plaintiff's right to equal protection by not treating Plaintiff the same as other Directors.

230.    Plaintiff has been injured by being deprived of her rights and privileges as a citizen of the United States and has been damaged as a result thereof.

## COUNT VI

### Intentional Infliction of Emotional Distress
### Individual Defendants[1]

231.    All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

232.    The attack on Plaintiff by the individual Defendants acting individually, in concert, and/or as an agent, servant, employee acting within the scope, course or in furtherance of their employment was intentional, extreme, outrageous, and exceeded all reasonable bounds of decency.

233.    As a proximate result of the individual Defendants', William Gretzula, Joseph O'Brien, Debra Wachspress, Joshua Waldorf, and Christine Toy-Dragonis' actions, and/or inactions, the Plaintiff suffered substantial damages, including but not limited to severe emotional distress, mental anguish, embarrassment, personal humiliation, physical injuries, and sleep deprivation.

---

[1] Plaintiff is not proceeding with Count VI against Donna Dunar.

234.    The individual Defendants' willful and intentional conduct was malicious and/or outrageous and the Defendants are liable to the Plaintiff for punitive and compensatory damages.

## COUNT VII

**Defamation/Slander**
**Individual Defendants[2]**

235.    All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

236.    Some or all of the statements referenced above were made specifically about Plaintiff and mention her by name.

237.    The statements referenced above which were made by , individual Defendants, William Gretzula, Joseph O'Brien, Debra Wachspress, Joshua Waldorf, and Christine Toy-Dragoni as outlined herein are defamatory as a matter of law.

238.    The statements referenced above falsely accuse Plaintiff of committing one or more crimes and falsely impugn her fitness for her former position.

239.    Individual Defendants, William Gretzula, Joseph O'Brien, Debra Wachspress, Joshua Waldorf, and Christine Toy-Dragoni knew the statements were false.

240.    Individual Defendants, William Gretzula, Joseph O'Brien, Debra Wachspress, Joshua Waldorf, and Christine Toy-Dragoni recklessly disregarded the falsity of the statements.

241.    Individual Defendants, William Gretzula, Joseph O'Brien, Debra Wachspress, Joshua Waldorf, and Christine Toy-Dragoni published the false and defamatory statements to at least one person, but generally to a much broader audience.

242.    Individual Defendants', William Gretzula, Joseph O'Brien, Debra Wachspress, Joshua

---

[2] Plaintiff is not proceeding with Count VII against Donna Dunar.

Waldorf, and Christine Toy-Dragonis' conduct shows actual malice on their part.

243.    Plaintiff has suffered damages as a direct and proximate result of those statements.

244.    As a result of Individual Defendants', William Gretzula, Joseph O'Brien, Debra Wachspress, Joshua Waldorf, and Christine Toy-Dragonis' reckless, deliberate, willful and wanton tortious acts Plaintiff was subjected to both public and private ridicule, shame, and humiliation, loss of contractual relations, loss of employment, loss of earnings and/or additional monetary damages, and great mental anguish that she will continue to endure for an indefinite time in the future, all to her great detriment and loss.

**COUNT VIII**

**Respondeat Superior
Pennsbury School District**

245.    All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

246.    At all times relevant hereto, Defendants were employed by, and agents, servants and/or employees of, Defendant, Pennsbury School District, and a significant amount of the described acts were committed within the course, scope or in furtherance of their employment.

247.    The Defendant, Pennsbury School District is responsible for all of the negligent and/or intentional acts committed by Defendants within the scope of their employment.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against each Defendant and that it enter an Order as follows:

a.    The Defendants are to be permanently enjoined from engaging in discrimination against the Plaintiff on any other basis prohibited under applicable law;

b.  The Defendants are to be prohibited from continuing to maintain their illegal policy, practice, or custom of permitting discrimination and retaliation in the workplace, and are to be ordered to promulgate an effective policy against such harassment and discrimination and to adhere thereto;

c.  The Defendants are to be prohibited from continuing to maintain their unlawful policy, practice, or custom of discriminating against employees and are to be ordered to promulgate an effective policy against such discrimination and to adhere thereto;

d.  The Defendants are to compensate the Plaintiff, reimburse the Plaintiff, and to make Plaintiff whole for any and all pay and benefits the Plaintiff would have received had it not been for the Defendants' illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, medical and other benefits, training, promotions, pension, and seniority. The Plaintiff should be accorded those benefits illegally withheld from the date the Plaintiff first suffered discrimination at the hands of the Defendants or their agents until the date of verdict ;

e.  The Plaintiff is to be awarded actual damages, as well as damages for the pain, suffering, and humiliation caused by the Defendants' actions to the extent they are available as a matter of law;

f.  Only to the extent available as a matter of law, Plaintiff is to be awarded punitive damages.

g.  The Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper, and appropriate;

h.  The Plaintiff is to be awarded the costs and expenses of this action and attorneys fees as provided by applicable federal and state law;

i.  Any verdict in favor of the Plaintiff is to be molded by the Court to maximize the financial recovery available to the Plaintiff in light of the caps on certain damages set forth in applicable federal law and to reflect the tax consequences thereof;

j.  The Plaintiff is to be granted such additional injunctive or other relief as may be requested during the pendency of this action in an effort to ensure the Defendants do not engage – or cease engaging – in unlawful retaliation against Plaintiff or other witnesses in this action;

k.  The Court is to maintain jurisdiction of this action after verdict to ensure compliance with its Orders therein.

l.  Plaintiff demands trial by jury on all issues so triable pursuant to Fed.R.Civ.P. 38.

Respectfully submitted,

KOLMAN LAW, P.C.

/s/ *Kathryn E. Liebhaber*
Kathryn E. Liebhaber, Esquire
Timothy M. Kolman, Esquire
414 Hulmeville Avenue
Penndel, PA 19047
(T) 215-750-3134 / (F) 215-750-3138
*Attorneys for Plaintiff*

Dated: June 26, 2020